<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DR. PETER A. CRIST *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CENLAR FSB *et al.*, <br><br> Defendants. | Civil Action No. 23-3448 (MAS) (TJB) <br><br> **MEMORANDUM OPINION** |

<u>**SHIPP, District Judge**</u>

This matter comes before the Court on Defendant Cenlar FSB's ("Cenlar") Motion to Dismiss Plaintiffs Dr. Peter A. Crist and Hilary J. Crist's (collectively, the "Crists") Amended Complaint (ECF No. 6) pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (ECF No. 8.) The Crists opposed (ECF No. 9), and Cenlar replied (ECF No. 10). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons stated below, the Court grants Cenlar's Motion to Dismiss.

**I. BACKGROUND**[2]

Sometime around May 2006, the Crists took out a mortgage loan (the "Loan") from CitiMortgage in the original principal amount of $1,000,000.00. (Am. Compl. ¶ 10, ECF No. 6.) Approximately thirteen years later, in April 2019, CitiMortgage transferred servicing of the Loan

---

[1] Hereinafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure.

[2] In considering the instant Motion, the Court accepts all factual allegations in the Amended Complaint as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

to Cenlar. (*Id.* ¶ 12.) Exactly one year later, the Crists experienced financial hardship and applied for and were granted a forbearance by Cenlar.[3] (*Id.* ¶¶ 12, 14.) In April 2021, the Crists's mortgage forbearance began to approach the allowed limit. (*Id.* ¶ 15.) Due to long-term financial hardship, the Crists then applied for a loan modification that same month. (*Id.*) In June 2021, Cenlar communicated to the Crists that it had all the documentation it needed to process their request for a loan modification.[4] (*Id.* ¶ 16.) Despite these representations, the Crists subsequently received additional information requests from Cenlar over the next eleven months.[5] (*Id.* ¶¶ 21-25.) The Crists complied with all additional requests. (*Id.*)

After four separate representations[6] that the loan application was complete, Cenlar approved the Crists's request for a loan modification approximately fourteen months after the Crists's initial application. (*Id.* ¶ 27) In doing so, Cenlar provided a loan modification approval letter dated June 28, 2022, which included, among other terms, a borrower contribution of $75,000.00 and monthly payments of $9,379.13, with a term ending September 1, 2037. (*Id.* ¶ 28.) The approval letter made clear that the agreement had not yet been finalized and that the final agreement may contain "additional requirements and/or contributions." (*Id.* ¶ 29.)

---

[3] Up until this point, the Crists made regular timely payments for fourteen years. (Am. Compl. ¶ 13.)

[4] Cenlar made repeated requests for additional information from the Crists when originally reviewing the application. (Am. Compl. ¶ 16.)

[5] In January 2022, Cenlar sent the Crists a letter denying their application for a loan modification due to insufficient income, which they appealed in February 2022. (Am. Compl. ¶¶ 20-21.) After a request for additional information by Cenlar, it notified the Crists that their application was sent to underwriting and would receive a determination within thirty days. (*Id.*)

[6] In June 2021 (Am. Compl. ¶ 16), December 2021 (*id.* ¶ 18), April 2022 (*id.* ¶ 22), and May 2022 (*id.* ¶ 24), the Crists were told that their application was complete.

The approval letter also stated that "[the Crists] will be sent [their] final modification agreement in a separate letter." (*Id.*)

The Crists waited two weeks for the final loan modification agreement (the "Agreement") before they contacted Cenlar. (*Id.* ¶¶ 30-31.) When the Crists still had not received the Agreement as of July 19, 2022, they became concerned that the loan modification would not be finalized before their Loan payment became due on August 1, 2022. (*Id.*) That same day, the Crists called Cenlar and discussed replacing the loan modification with a deferment plan under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). (*Id.*) The Crists were told that enrollment in a deferment plan would lower their monthly mortgage payment to $8,548.67 but would also require immediate payment of $85,084.40. (*Id.* ¶ 31.) The Crists were also told for the first time that they needed to pay this lump sum "immediately" before they received the final loan modification agreement from Cenlar. (*Id.*) At this point, the Crists believed that they were presented with two options: (1) adopt the deferment plan, which required payment of $85,084.40 "immediately" and had a lower monthly payment over the entire loan term, or (2) adopt the loan modification, which now required payment of $85,084.40 "immediately" to receive the Agreement and had a higher monthly payment. (*Id.*) The Crists opted for the deferment plan instead of the loan modification. (*Id.*) The Crists, therefore, authorized an immediate wire transfer of $85,084.40 to Cenlar to implement the deferment plan. (*Id.*)

Things took an unexpected turn the very next day: the Crists received the final loan modification agreement dated July 13, 2022 in the mail from Cenlar.[7] (*Id.* ¶ 32; Am. Compl. Ex. A, ECF No. 6-1 at *3.) To the Crists's surprise, the Agreement made no mention of a

---

[7] During a conversation with Cenlar on August 12, 2022, the Crists learned for the first time that Cenlar did not have access to the final loan modification agreement and that it would not be uploaded to Cenlar's online portal for another 30-45 days. (Am. Compl. ¶¶ 49-50.)

3

$75,000.00 borrower contribution, the financial requirement that prompted the Crists to seek deferment instead. (Am. Compl. ¶ 32.) Rather, the Agreement afforded the Crists an opportunity to make a monthly payment of $9,379.13 with no borrower contribution required. (*Id.* ¶¶ 28, 32.) With the new terms in hand, the Crists greatly preferred the Agreement over the deferment, which required them to wire $85,084.40 and make a monthly payment of $8,548.67. (*Id.* ¶ 31.) As such, after reviewing the Agreement in full, the Crists called Cenlar on July 20, 2022 to cancel the deferment plan and opt for the Agreement instead. (*Id.* ¶ 33.) On the call, the Crists also requested the return of their $85,084.40 payment that had been paid to implement the deferment plan. (*Id.* ¶ 33.) Five days later, the Crists signed and notarized the Agreement for the modification and sent it to Cenlar. (*Id.* ¶ 36.) Cenlar received the executed Agreement the next day. (*Id.* ¶ 37.)

While reviewing their monthly statement on Cenlar's online portal, the Crists became concerned when their August 2022 mortgage payment reflected the amount promised under the deferment plan, not the loan modification agreement. (*Id.* ¶ 39.) They also noticed that Cenlar deducted $41,081.56 from their escrow account without explanation. (*Id.*) The Crists made numerous phone calls to Cenlar, requesting clarification and a refund of their $85,084.40.[8] They spoke with no less than ten different Cenlar representatives, some of whom promised a prompt refund, and some of whom stated that a refund would not be issued. (*Id.* ¶¶ 38-71.)

On August 19, 2022, the Crists sent a Qualified Written Request/Notification of Error ("QWR/NOE") to Cenlar. (*Id.* ¶ 56.) The Crists's letter requested the return of $75,717.45[9] and copies of all account statements for Account Number 4766486775 from June 2022 through

---

[8] Specifically, the Crists spoke to Cenlar representatives on July 29, August 1, August 3, August 9, August 12, and November 9. (*Id.* ¶¶ 38-71.)

[9] This amount represents the canceled payment by the Crists that was wired, less an authorized payment of $9,366.95 for the August 2022 mortgage and escrow payment. (Am. Compl. Ex. B., ECF No. 6-1 at *10.)

August 19, 2022. (Am. Compl. Ex. B, ECF No. 6-1 at *10-11.) As of the filing of the Complaint, Cenlar acknowledged receipt but produced no substantive[10] response. (Am. Compl. ¶¶ 58, 68.)

On June 26, 2023, the Crists filed the instant action. (*See generally* Compl., ECF No. 1.) Then, on August 14, 2023, the Crists filed an Amended Complaint alleging: (1) violation of RESPA (Count I), (2) conversion (Count II), (3) common law fraud (Count III), (4) consumer fraud under N.J.S.A. 56:8-2 (Count IV), and (5) common law negligent misrepresentation (Count V). (*See generally* Am. Compl.)

## II.   LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Importantly, on a Rule 12(b)(6) motion to dismiss, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

A complaint must set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "fair notice of what the . . . claim is and the grounds upon which

---

[10] Cenlar sent the Crists a letter dated August 24, 2022 acknowledging receipt of the request. (Am. Compl. ¶ 58.) The Crists received a subsequent letter from Cenlar dated August 31, 2022 acknowledging receipt once more. (*Id.* ¶ 59.) The Crists received a third letter dated September 6 2022 informing the Crists that its review was taking longer than anticipated and that it needed additional time to respond to the Crists's inquiry. (*Id.* ¶ 60.)

it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)). In the end, a court will grant a motion to dismiss brought under Rule 12(b)(6) if the factual allegations in the complaint are insufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### III.  DISCUSSION

Cenlar moves to dismiss Counts I, II, and V of the Crists's Amended Complaint, arguing that each is insufficiently pled as a matter of law. For the following reasons, the Court dismisses the Crists's RESPA claim (Count I) and declines to exercise supplemental jurisdiction over the Crists's remaining state law claims (Counts II-V).

#### A.  Federal Claim

The Crists allege in Count I that Cenlar violated RESPA. (Am. Compl. ¶¶ 74-77.) "RESPA establishes a mechanism for borrowers to obtain information from and to contest errors made by their mortgage servicers." *Schepisi v. Santander Bank, N.A.*, No. 18-15006, 2019 WL 699959, at *2 (D.N.J. Feb. 20, 2019). "To that end, the statute requires that servicers of mortgage loans respond to inquiries from borrowers regarding their loans within a set amount of time." *Heyman v. CitiMortgage, Inc.*, No. 14-1680, 2019 WL 2642655, at *35 (D.N.J. June 27, 2019) (citing 12 U.S.C. § 2605). If a loan servicer "receives a [QWR] from the borrower . . . for information relating to the servicing" of a "federally related mortgage loan," the loan servicer must "make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction," or explain to

the borrower why "the servicer believes the account of the borrower is correct" or "why the information requested is unavailable." 12 U.S.C. § 2605(e)(1), (2). The loan servicer must respond to a QWR within thirty days after receipt. *Id.* § (e)(2).

To establish a RESPA claim, a plaintiff must show: "(1) the submission of a qualified written request by a borrower to a loan servicer for information relating to the servicing of the loan, (2) a failure by the loan servicer to timely respond, and (3) damages." *Davis v. Deutsche Bank Nat'l Tr. Co.*, No. 16-5382, 2017 WL 6336473, at *7 (E.D. Pa. Dec. 12, 2017) (citing *Hawk v. Carrington Mortg. Servs., LLC*, No. 14-1044, 2016 WL 4414847, at *4 (M.D. Pa. June 29, 2016)). Under RESPA, a plaintiff can recover actual damages and, "in the case of a pattern or practice of noncompliance," statutory damages in "an amount not to exceed $2,000." 12 U.S.C. § 2605(f).

To state a claim for actual damages, a plaintiff must show both the existence of damages and that the breach caused the damages. *Jones v. Select Portfolio Servicing, Inc.*, No. 08-972, 2008 WL 1820935, at *9-10 (E.D. Pa. Apr. 22, 2008). The "borrower has the responsibility to present specific evidence to establish a causal link between the financing institution's violation and [the borrower's] injuries." *Hager v. CitiMortgage, Inc.*, No. 16-3348, 2017 WL 751422, at *4 (D.N.J. Feb. 27, 2017) (internal quotation marks omitted) (quoting *Block v. Seneca Mortg. Servicing*, No. 16-0449, 2016 WL 6434487, at *22 (D.N.J. Oct. 31, 2016)). That is, "RESPA requires the damages to flow as a result of the violation." *Giordano v. MGC Mortg., Inc.*, 160 F. Supp. 3d 778, 782 (D.N.J. 2016) (citation omitted). "Actual damages encompass compensation for any pecuniary loss including such things as time spent away from employment while preparing correspondence to the loan servicer, and expenses for preparing, photocopying and obtaining certified copies of correspondence." *Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 799 (E.D. Pa. 2014) (quoting

7

*Cortez v. Keystone Bank, Inc.*, No. 98-2457, 2000 WL 536666, at *12 (E.D. Pa. May 2, 2000)). For statutory damages, a plaintiff must show a "pattern or practice of noncompliance with the requirements of § 2605." *Hager*, 2017 WL 751422, at *4. In other words, "[t]he plaintiff must show that the alleged violations were the standard or routine way of operating for the allegedly non-compliant loan servicer." *Davis*, 2017 WL 6336473, at *7 (citing *McLean v. GMAC Mortg. Corp.*, 595 F. Supp. 2d 1360, 1365 (S.D. Fla. 2009)).

The sole issue before the Court is whether the Crists sufficiently alleged actual damages in their Amended Complaint.[11] That is, whether the Crists raise specific facts to plausibly allege a causal link between the financing institution's violation and their injuries.

Here, the Court finds that the Crists fail to sufficiently allege actual damages. The Crists allege that "[b]ecause of [Cenlar's] failure to respond [to the QWR], [they] have continued to suffer mental anguish over the loss of monies that are not accounted for and the need to rearrange their finances in a way they had not anticipated." (Am. Compl. ¶ 77.) The Crists's bare allegations are insufficient as they do not adequately allege that the alleged mental anguish was "as a result of" the financing institution's violation—the failure to respond to the QWR letter—as opposed to the financial hardships they were already facing. *Giordano*, 160 F. Supp. 3d at 785 ("Even construing [the allegations] in [p]laintiff's favor, her distress was not related to the April 29, 2010 QWR letter." (citation omitted)). "If a plaintiff simply can allege that failure to respond to a letter caused [mental anguish], without more, any RESPA claim would survive a motion to dismiss." *Id.* Put simply, the Crists's Amended Complaint falls short of alleging any facts that specifically tie their mental anguish to Cenlar's failure to timely and adequately respond to the QWR letter.

For these reasons, the Court dismisses Count I of the Amended Complaint.

---

[11] Since the Crists do not allege statutory damages, the Court will only evaluate whether actual damages were sufficiently pled.

B.  **State Law Claims**

Having now dismissed the RESPA claim, the only claim over which this Court had original jurisdiction, the Court must consider whether to exercise supplemental jurisdiction over the Crists's remaining state law claims.

The Court possesses discretion in exercising supplemental jurisdiction and may decline to do so if "all claims over which it has original jurisdiction" are dismissed. 28 U.S.C. § 1367(c). Federal district courts are given supplemental jurisdiction over state claims that "form part of the same case or controversy" as the federal claims over which the courts have original jurisdiction. *Id.* § 1367(a). The decision of whether to exercise supplemental jurisdiction where a court has dismissed all federal claims is left to the court's discretion as supplemental jurisdiction "is a doctrine of discretion, not of [a] plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). When deciding whether to exercise supplemental jurisdiction over state law claims, federal courts should consider "judicial economy, convenience, and fairness." *Hedges*, 204 F.3d at 123 (citations omitted). When all federal claims are eliminated before trial, however, those factors "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

As it is early in this case and the Crists's state claims predominate over their potential federal claims, the Court declines to exercise supplemental jurisdiction over the Crists's state law claims (Counts II-V). The Court, however, will permit the Crists an opportunity to

amend their Complaint because additional factual allegations, as outlined in the Crists's Opposition, may impact this Court's analysis.[12]

## IV. CONCLUSION

For the foregoing reasons, the Court grants Cenlar's Motion to Dismiss. The Court will enter an order consistent with this Memorandum Opinion.

Dated: 6/17/2024

                                                                                            /s/ Michael A. Shipp
                                                                                            MICHAEL A. SHIPP
                                                                                            UNITED STATES DISTRICT JUDGE

---

[12] If the Crists decide to amend their Complaint, and can sufficiently allege RESPA damages, the Court's analysis may change. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (alteration in original) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984))).